420 F.2d 616
 Earl COLEMAN, Appellant,
v.
UNITED STATES of America, Appellee.
Alvin J. TOBIN, Appellant,
v.
UNITED STATES of America, Appellee.
Ronald ALLSTON, Appellant,
v.
UNITED STATES of America, Appellee.
Winfield L. ROBERTS, Appellants,
v.
UNITED STATES of America, Appellee.
 Nos. 21804-21806.
 No. 21856.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 18, 1969.
 Decided November 28, 1969.
 Petition for Rehearing in No. 21856 Denied December 18, 1969.
 
 Mr. Peter D. O'Connell, Washington, D.C., with whom Mr. William F. Wetmore, Jr., Washington, D.C. (both appointed by this court), was on the brief, for appellants in Nos. 21,804, 21,805 and 21,806.
 Mr. Robert L. Wright, Washington, D.C. (appointed by this court), for appellant in No. 21,856.
 Mr. Julius A. Johnson, Asst.U.S. Atty., with whom Messrs. David G. Bress, U.S.Atty., at the time the brief was filed, and Victor W. Caputy, Asst. U.S.Atty., were on the brief, for appellee. Messrs. Thomas A. Flannery, U.S. Atty., and Roger E. Zuckerman, Asst.U. S.Atty., also entered appearances for appellee.
 Before BAZELON, Chief Judge, and TAMM and ROBB, Circuit Judges.
 ROBB, Circuit Judge:
 
 
 1
 The appellants Earl Coleman, Alvin Tobin, Ronald Allston and Winfield Roberts were convicted on twelve counts of an indictment:[1] one count charging them jointly with unauthorized use of a motor vehicle on or about November 15, 1966 (22 D.C.Code § 2204); one count charging that on November 22, 1966 they entered The National Bank of Washington, D.C., Brookland Branch, with intent to commit robbery (18 U.S.Code § 2113 (a)); five counts charging them jointly with robbery of the Bank on November 22, 1966, in violation of 18 U.S.Code § 2113(a); and five counts alleging the same robberies on November 22, 1966, in violation of 22 D.C.Code § 2901.[2] Each was sentenced to prison for not less than one nor more than five years on the unauthorized use count and from five to fifteen years on each of the remaining counts, the sentences to run concurrently.
 
 
 2
 At a few minutes before 9:56 A.M. on November 22, 1966, the Brookland Branch of The National Bank of Washington, on 12th Street, N.E. near Perry Street, was held up. As they were afterwards to testify some of the tellers on duty saw three men enter the bank with drawn guns, others saw four. The bandits, Negro males, were masked with dark glasses to which scarfs or bandanas were attached. Witnesses noticed that one or more wore dark hats, dark gloves, and raincoats or carcoats. The bandits ordered the Bank employees and customers to lie down on the floor. One of the tellers, a lady, was talking on the telephone at the time and was slow in complying with this order. A bandit pushed her, took the telephone receiver out of her hand and struck her in the face with it, breaking her nose. She noticed that this man wore a black hat, sun glasses with a multi-colored bandana tied to them, a dark carcoat, khaki pants and dark gloves. He carried a short-barreled pistol.
 
 
 3
 Having placed the employees and customers on the floor the bandits "went through and took the money out of the tellers' cages", gathering it up in "dirty white" bags that "looked like pillow cases". The money, in bills and coins, amounted to $15,308.32. Included in the loot were bills the serial numbers of which had previously been recorded by the Bank and packets of bills and rolls of coins bearing notations in the handwriting of Bank employees.
 
 
 4
 The holdup took only a few moments. Before the bandits left, carrying the bags of money, one of the Bank employees was able to set off the holdup alarm; and after they left another employee got up from the floor, looked out the front window and saw the bandits getting into a dirty light blue or white automobile. She noted and wrote down the tag number of the car. It was a District of Columbia tag, 251-219. She watched the car leave the Bank, head towards Perry Street, and turn left on Perry.
 
 
 5
 At 9:56 A.M. Officers Ervin and Darzinsky of the Metropolitan Police, who were patrolling in a scout car, responded to the alarm from the Bank. Having spoken to the Bank manager they set out in search of the getaway car. Within minutes they found it abandoned on Perry Street, two blocks from the Bank. It was a blue Mustang bearing D. C. tags 251-219. The engine was running, the door on the driver's side was open, and rolls of coins were scattered on the floor boards and on the ground outside. A loaded automatic pistol was lying on the right of the front seat. The car was parked almost in front of the house of a Mrs. Rosser. When questioned by the officers she told them that at about 9:20 A.M. that morning she had noticed a U-Haul truck, shaped like a Volkswagen bus, parked in front of her house. Shortly afterwards she heard a noise "like a high speed speeding away". She looked out the window again and noticed that the U-Haul truck was gone. Acting on this information Officer Ervin broadcast a lookout for a U-Haul truck.
 
 
 6
 At 9:56 A.M. Officers Lukic and Yates of the Metropolitan Police, patrolling in another scout car, heard a "flash" lookout that there was a holdup in progress at the Brookland Branch of The National Bank of Washington. Five or ten minutes later they received a second message "to look out for four Negro males, one Negro male was dark skinned, heavy build and wearing a large bushy mustache. These Negro males * * * entered a blue Mustang with D. C. registration and were seen leaving the scene of holdup." The tag number of the Mustang was included in the message. Five or ten minutes after this second message the officers heard a third broadcast that "the blue Mustang was found abandoned and that they [the bandits] now may be in a U-Haul van-type truck."
 
 
 7
 Promptly after receiving the lookout for a U-Haul van-type truck Officers Lukic and Yates stationed themselves on an overpass overlooking Kenilworth Avenue, N. E., which they "figured * * * would be a good escape route". In a few minutes they saw a U-Haul van-type truck bound down Kenilworth Avenue. Only one man, the driver, was visible in the truck. The officers "came up behind" the truck and Officer Lukic saw the face of the driver in the truck's large rear-view mirror. The driver was a Negro male, dark skinned, with a heavy mustache. Turning on their red light and siren the officers "pulled the truck over" on Kenilworth Avenue about four blocks from the place where they had first seen it. Before the truck stopped Officer Yates noticed a Negro male looking out through one of the small windows in the rear of the van, "peeping quickly and going down". When the truck and the police car stopped, the police car being to the rear of the truck, the driver of the truck, who turned out to be Coleman, got out and walked towards the policemen, who also got out of their car and walked towards Coleman and the truck. As he walked Officer Lukic "observed a head bob up" at one of the small rear windows of the truck and then quickly duck "back down inside the truck". At this point Lukic drew his gun and told Coleman to turn and put his hands on the side of the truck. Opening the truck's rear doors the officers discovered Tobin, Allston and Roberts inside, lying on a mattress. Also in the truck was more than $14,900 in bills and coins, together with a number of articles of clothing. A fully loaded short-barreled .38-caliber revolver was on the floor behind the driver's seat. A loaded .22-caliber starter's pistol was found in Coleman's right pants pocket.[3]
 
 
 8
 Among the articles of clothing and equipment found in the U-Haul truck with the appellants were the following: 4 pairs of sun glasses; 4 scarfs or bandanas; 4 pairs of brown work gloves; 2 pillow cases; 4 felt hats; 2 trench coats; 1 raincoat; 2 jackets. A black silk scarf was found in Allston's pocket. Witnesses at the trial identified many of these articles as similar to those worn by the bank robbers. Also found in Allston's trousers pocket was a packet of twenty-dollar bills. At trial these bills were identified by their serial numbers as part of the money taken from the Bank. In addition, several thousand dollars in bills and rolls of coins recovered in the truck were identified by serial numbers and bank markings as part of the loot. When recovered, most of this money was stuffed in two pillow cases; the rest was scattered on the floor of the truck. Finally, evidence at the trial established that the several rolls of quarters, dimes and nickels recovered in the blue Mustang getaway car, or on the ground nearby, had been taken from the Bank that morning.
 
 
 9
 Evidence at the trial established that the blue Mustang had been stolen about November 15, 1966 from a used-car lot, where it was parked with the keys on the dashboard. No tags were on the car when it was stolen. As we have said, when it was recovered on Perry Street on November 22 it bore D. C. tags 251-219. These tags had been issued for a 1956 Dodge which was acquired by Coleman in October 1966. As for the U-Haul truck in which the appellants were apprehended, the proof was that this vehicle was rented by one Alvin Douglas, at the instance of Coleman, and with Coleman's money, on November 20, 1966. At the time he received the U-Haul truck Coleman removed a mattress from another truck that he had, and placed it in the U-Haul truck. The appellant Tobin was with Coleman on this occasion.
 
 
 10
 The appellant Roberts testified at the trial that he had no part in the bank robbery. He said he left home about 8:00 o'clock on the morning of November 22 to visit a young lady who lived near Kenilworth Avenue. Finding that she was not at home he went to a bus stop on Kenilworth Avenue where he was waiting when the U-Haul truck driven by Coleman came by, "slowed up" and his friend Tobin, who was sitting on a mattress in the truck with Allston, opened the door and offered Roberts a ride. Roberts said he got into the truck, but that he had ridden only two or three blocks when the truck was stopped by the police and he was arrested. He testified that he did not know Coleman or Allston. He did not notice the contents of the truck, he said, except for the mattress on the floor, on which the men were sitting.
 
 
 11
 Roberts was the only defendant to take the stand before both sides announced that they rested. Before final argument began, however, counsel[4] for Tobin moved to reopen the case so that his client might testify. Counsel stated that "I thought it was going to be the defense which was shared by counsel in the case" that Tobin, Allston and Robetts "were picked up by Coleman who was driving the truck and that they got into the truck and they knew nothing about any bank robbery, and that is inconsistent, of course, with what I heard and I was taken by surprise and my client would like to testify that he did not know anything about it. He wasn't going to take the stand, but he has changed his mind and now he does want to take the stand." Tobin was then permitted to testify over the objection of counsel for Roberts. His story was that on the morning of November 22, he was on Kenilworth Avenue "catching out", that is waiting in the hope that someone from a construction company "would come and pick me up * * * to go out as a helper." He said he had been waiting about two hours when Allston came along on his way to a liquor store. Allston tarried with Tobin and in a few minutes Coleman drove by in the U-Haul truck. Tobin "flagged him down" and Allston and Tobin got into the truck. Almost immediately thereafter, according to Tobin, the truck stopped again and picked up Roberts, and the three men sat on the mattress until they were arrested a few moments later. Tobin swore that although he knew Coleman, Roberts and Allston, he had nothing to do with the holdup. He said he was with Coleman when Coleman rented the U-Haul truck, but he understood the truck was to be used by Coleman in moving some of his household goods.
 
 
 12
 In rebuttal the government introduced the testimony of police officers to the effect that the U-Haul truck made no stops in the blocks on Kenilworth Avenue where the appellants claimed they had been picked up.
 
 
 13
 Against the background of these facts we now consider the errors assigned by the appellants.
 
 
 14
 * The appellants assert that there was no probable cause for their arrest and that the search of the U-Haul truck was therefore unlawful. We think, however, that Officers Lukic and Yates acted reasonably in stopping the truck and arresting its occupants. Within twenty minutes after the robbery the officers were alerted to look out for a U-Haul van-type truck occupied by four Negro males, one of whom was dark-skinned and wearing a large mustache. Moments after receiving this information they saw a U-Haul van-type truck proceeding on a logical escape route. It was driven by a dark-skinned Negro male with a heavy mustache. Before stopping the truck one of the officers noticed furtive movements by one or more Negro males inside the truck. Had the officers failed to stop the truck under these circumstances they would have been remiss in their duty. The "exigencies of the situation" made their action imperative. Bailey v. United States, 128 U.S.App.D.C. 354, 358, 389 F.2d 305, 309 (1967). As we have repeatedly noted the existence of probable cause "depends on the facts and circumstances of the particular case * * * and on the `practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Bailey v. United States, 128 U.S. App.D.C. 354, 357, 358, 389 F.2d 305, 308, 309 (1967), quoting from Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Probable cause exists when the officer "in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police experience, reasonably could have believed that a crime had been committed by the person to be arrested." Jackson v. United States, 112 U.S.App.D.C. 260, 262, 302 F.2d 194, 196 (1962). "Conduct innocent in the eyes of the untrained may carry entirely different `messages' to the experienced or trained observer." Davis v. United States, 133 U.S.App.D.C. 172, 174, 409 F.2d 458, 460, cert. den., 395 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969). And the element of flight in a vehicle from the scene of the crime may tip the scales in favor of probable cause. Bailey v. United States, supra. See also Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Dixon v. United States, 111 U.S.App.D.C. 305, 296 F.2d 427 (1961); Dorsey v. United States, 125 U.S.App.D.C. 355, 372 F.2d 928 (1967). Judged by these criteria the actions of the officers were reasonable and lawful.
 
 II
 
 15
 The appellant Allston complains of the cross examination of his "character" witness. The witness testified that she had known Allston for about nine years, that she knew other persons in the community in which he lived who in turn knew him, that she knew what his reputation was among these persons, and that his reputation for "peace and good order" and for "honesty" was good. On cross examination she testified that she had discussed Allston's reputation for peace and good order and honesty with the people who knew him. Over the objection of Allston's counsel the Assistant United States Attorney then asked the witness whether she had heard that (1) on September 18, 1964, Allston was convicted of petty larceny; (2) on June 17, 1966, Allston was convicted of petty larceny; (3) on January 26, 1967 he was convicted of petty larceny; and (4) on October 24, 1957 he was convicted of a violation of the Federal Narcotics laws. The witness responded that she thought she had heard of the 1966 petty larceny conviction but she had not heard of the others. The record discloses that before permitting the Assistant United States Attorney to ask these impeaching questions the district judge was careful to satisfy herself from court records that the convictions inquired about had in fact occurred.
 
 
 16
 Immediately after the witness left the stand the district judge instructed the jury:
 
 
 17
 "Members of the jury, with reference to Inez Milton, the last witness called by Mr. Mack, you are told this: The defendant, Mr. Allston, called Inez Milton as a character witness, and the basis for the evidence given by that character witness is the reputation of the defendant, Mr. Allston, in the community.
 
 
 18
 "Since the defendant, Mr. Allston, has thus tendered the issue of his reputation, Mr. Caputy, the Assistant United States Attorney, was permitted to ask the witness, Inez Milton, if she had heard of certain incidents.
 
 
 19
 "You are told that you are not to assume that the incidents asked about actually took place and you are not to consider them, in fact, you are to put those incidents out of your mind so far as the defendant Allston, himself, is concerned.
 
 
 20
 "The questions referred to were permitted so as to test the standard of information of the character witness, herself, as to the reputation of the defendant Allston. In other words, these questions to a character witness and her answer thereto, are to be taken into consideration by the jury only in weighing the evidence of the character witness, Inez Milton, that is, testing the standard of character evidence and the opinions that this character witness seemed to have."
 
 
 21
 In her charge to the jury the district judge, after instructing as to the weight that might be given to evidence of the appellant's good reputation, repeated and emphasized her previous instruction limiting the effect of the prosecutor's impeaching questions.[5]
 
 
 22
 There was no error in the procedure followed by the district judge and the Assistant United States Attorney. The impeaching questions were carefully phrased; each of them followed the proper formula, beginning "Have you heard?". The convictions to which they related were plainly relevant to the testimony of the witness. The limiting and explanatory instructions by the district judge, and indeed the entire procedure, were precisely in accord with the ruling of the Supreme Court in Michelson v. United States, 335 U.S. 469, 69 S. Ct. 213, 93 L.Ed. 168 (1948). Awkard v. United States, 122 U.S.App.D.C. 165, 352 F.2d 641 (1965) and Shimon v. United States, 122 U.S.App.D.C. 152, 352 F.2d 449 (1965), relied upon by the appellant, are readily distinguishable. In the Awkard case the prosecutor inquired about arrests and a conviction that occurred after the period to which the character testimony related. In the Shimon case we held that the impeaching questions were not directed at the credibility of the witness but rather were intended to prejudice the defendant by innuendo. Cf. United States v. Wooden, 137 U.S.App.D.C. ___, 420 F.2d 251 (decided this day).
 
 III
 
 23
 The appellants Coleman, Tobin and Allston contend that fatal error occurred when the Court permitted counsel for Roberts,[6] in the presence of the jury, to call them as witnesses for Roberts and thus compel them to invoke their right to remain silent. It is argued that the error was compounded when counsel for Roberts in his closing argument to the jury referred to the refusal of the co-defendants to take the stand.
 
 
 24
 When Roberts left the stand after completing his testimony his counsel announced in the presence of the jury: "Your Honor, I call Earl Coleman to the stand". A conference at the bench followed, in which Coleman's counsel stated that his client would decline to testify. He asked that the Court "make some explanation as non-violent as possible why he is not going to testify". The Court responded "I will simply say that he has the right to take it or not take it as he sees fit. And then just simply say that he elects not to. Is that all right?" Coleman's counsel answered "That is agreeable to me, Your Honor." Counsel for Allston stated that his client would not testify and that he did not want him to be called as a witness by Roberts. Tobin's counsel also took this position. Counsel for Roberts insisted that "I am not going to be restricted, Your Honor. I have a right to call any witness I desire * * * I have a right in open court to ask for a witness. The witness has a right not to testify by invoking his privilege."
 
 
 25
 After the bench conference all counsel returned to the trial table and the following occurred in the presence of the jury:
 
 
 26
 "[Counsel for Roberts]: I believe * * * [Counsel for Coleman] was addressing the Court in reference to my request for a witness.
 
 
 27
 "THE COURT: You have asked that Earl Coleman —
 
 
 28
 "[Counsel for Roberts]: — be called as a witness.
 
 
 29
 "THE COURT: Earl Coleman has the right to take the stand or not to take it, as he sees fit.
 
 
 30
 * * * * * *
 
 
 31
 "[Counsel for Coleman]: Yes, Your Honor. Mr. Coleman declines to testify.
 
 
 32
 "THE COURT: Very well.
 
 
 33
 "[Counsel for Roberts]: Your Honor, I will now call Mr. Allston as a witness.
 
 
 34
 "THE COURT: The defendant Ronald Allston has the right to take the stand or not to take the stand as he sees fit.
 
 
 35
 "[Counsel for Allston]: I object, Your Honor's statement and I ask that it be stricken from the record and that the jury be instructed to disregard it. (sic)
 
 
 36
 "THE COURT: The Court declines to do so, * * * [Counsel for Roberts] having sought to call Mr. Allston as a witness.
 
 
 37
 "[Counsel for Roberts]: If the Court please, I now call Mr. Tobin as a witness.
 
 
 38
 "[Counsel for Tobin]: On behalf of the Defendant Tobin, we decline to take the stand on the basis of the Fifth Amendment.
 
 
 39
 "THE COURT: The attorney for the defendant Tobin has declined. You may not call him as a witness.
 
 
 40
 "[Counsel for Roberts]: If the Court please, may the record indicate the manner in which the various defendants are asserting their privilege?
 
 
 41
 "THE COURT: Just a moment.
 
 
 42
 "[Counsel for Roberts]: I am sorry.
 
 
 43
 "THE COURT: You are not making any further statement in reference to the defendants."
 
 
 44
 In his closing argument to the jury counsel for Roberts referred to his unsuccessful attempt to call the co-defendants as witnesses. The co-defendants objected and the Court responded "I believe I told the jury the other day that they may testify or may not as they please. A defendant has an absolute right not to testify if that is his choice." When counsel for Roberts persisted in this line of argument the Court admonished him, saying "I think you should cease commenting upon the other defendants".[7]
 
 
 45
 It was error to permit counsel for Roberts in the presence of the jury to call upon the co-defendants to testify, and he should not have been allowed to comment to the jury upon their failure to take the stand. Counsel's actions violated the rights of the defendants who did not testify, guaranteed by both the Fifth Amendment and the provisions of 18 U.S.C. § 3481.[8] Were this a case in which the question of guilt or innocence was close the error in permitting this conduct would require us to reverse the convictions of Coleman and Allston, who did not testify.[9] DeLuna v. United States, 308 F.2d 140, 1 A.L.R.3d 969 (5th Cir.1962), rehear. den., 324 F.2d 375 (1963); United States v. Housing Foundation of America, Inc., 176 F.2d 665 (3rd Cir.1949); Cf. United States v. Echeles, 352 F.2d 892 (7th Cir.1965); State v. Medley, 178 N.C. 710, 100 S.E. 591 (1919); State v. Smith, 74 Wash. 2d 749, 446 P.2d 571 (1968). See Hayes v. United States, 329 F.2d 209, 221-222 (8th Cir.), cert. den., sub nom. Bennett v. United States, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964). We are convinced beyond a reasonable doubt however that the error did not contribute to the conviction of Coleman and Allston and that it was therefore harmless. Efficient and intelligent work by the police, combined with skillful marshaling and presentation of the evidence by the prosecutor during seven days of trial, resulted in a case against the appellants Coleman and Allston that was overwhelming: The license tags on the Mustang getaway car belonged to Coleman. Two days before the holdup, Coleman, accompanied by Allston, arranged to rent the getaway truck and placed in it the mattress upon which the bandits reclined. Less than twenty-five minutes after the holdup he was arrested while driving the getaway truck. He had a pistol in his pocket. In the truck were proceeds of the holdup, a loaded revolver, and the disguises used by the robbers. The appellant Allston was lying concealed in the truck and in his pocket were a silk scarf, similar to the masks worn by the robbers, and a sheaf of twenty-dollar bills which was part of the loot. In the light of these facts it is inconceivable that any honest juror in his right mind could have had any doubt as to the guilt of Coleman and Allston, even if counsel for Roberts had never called them to the stand or commented on their failure to testify. In short, we think that this is a case for the application of the harmless error rule of Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), decided by the Supreme Court of the United States June 2, 1969. Cf. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); 28 U.S.C., § 2111; Fed.Rule Crim.Proc. 52(a).
 
 
 46
 We have carefully considered all of the other contentions of the appellants and find them to be without merit; however, we mention one further matter: The appellants were convicted and sentenced on the second count of the indictment alleging that in violation of 18 U.S.C. § 2113(a) they entered The National Bank of Washington, D.C., with intent to commit robbery therein. They were also convicted and sentenced on the third, fifth, seventh, ninth and eleventh counts alleging robbery of the Bank in violation of 18 U.S.C., § 2113(a). Although all of the sentences are to run concurrently, Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957) holds that one who is convicted of robbery under 18 U.S.C. § 2113(a) may not also be convicted under the same section of entering the Bank to commit robbery. We have recently considered this matter in Bryant v. United States, 135 U.S.App.D.C. 138, 417 F.2d 555 (decided August 7, 1969). In accordance with the procedure followed in that case and in the Prince case we therefore set aside the appellants' convictions on the second count of the indictment and remand for resentencing on the convictions under the other counts, which we affirm.
 
 
 47
 It is so ordered.
 
 
 
 Notes:
 
 
 [1]
 A thirteenth count charging Coleman with carrying a dangerous weapon, a pistol, without a license, was dismissed on motion of the government when it appeared during trial that the pistol was not capable of discharging a projectile
 
 
 [2]
 Each of the five counts charging robbery under 18 U.S.Code § 2113(a) corresponded with one of the five counts alleging robbery under 22 D.C.Code § 2901, and related to the theft of a specified sum of money from the cage of one of five tellers
 
 
 [3]
 See footnote 1 above
 
 
 [4]
 Not counsel on this appeal
 
 
 [5]
 The instruction was as follows:
 "The basis for the evidence given by the character witness called by Mr. Allston is the reputation of Mr. Allston in the community. The jury is instructed that Mr. Allston, by calling the character witness, put in issue in this case his reputation for peace and good order and for honesty and, because he did so, Mr. Caputy was permitted to question the character witness as to whether she had heard that Mr. Allston had committed certain offenses.
 "The jury is instructed that regardless of those questions and the answers thereto, the jury is not to assume or infer that any of the offenses inquired about were actually committed. The jury may take into consideration those questions and the answers thereto for a limited purpose only. That is, in weighing the evidence of the character witness, in testing her standard of information on the reputation of Mr. Allston and otherwise passing upon her credibility as a witness.
 "The jury is directed not to consider such questions and the answers thereto for any other purpose.
 "I have a few more statements to make to you on this same subject: The jury is instructed that questions put to the character witness as to any alleged prior offenses committed by Mr. Allston, and her answers thereto, are to be disregarded entirely by the jury, except to the extent that they bear on the credibility of the character witness. You are also instructed that such questions and the answers thereto are not to be considered as evidence that there have in fact been prior offenses by Mr. Allston.
 "Further, the jury is instructed that such questions and answers thereto are not to be considered as evidence of the guilt of Mr. Allston of the offenses charged in the indictment here."
 
 
 [6]
 Not counsel on this appeal
 
 
 [7]
 The transcript of the closing argument contains the following:
 "[Counsel for Roberts]: Roberts didn't even know Coleman and Allston. You heard him call each one of these defendants to the stand and you probably wondered why and how I intended to prove Roberts' story or how I was going to be able to say to each one of these other men: `Is it true that Roberts doesn't know you as he says he doesn't,' but I didn't have that opportunity. That was my purpose, in trying to call them, because the only way I could support his testimony is by putting some evidence on the stand to give you the situation —
 "[Counsel for Allston]: I must object to that, Your Honor. I think that this is not proper argument and I object, if the Court please, and I ask Your Honor to instruct the jury to disregard it.
 "[Counsel for Coleman]: I join in that.
 "[Counsel for Allston]: With reference to the other defendants.
 "THE COURT: I believe I told the jury the other day that they may testify or may not as they pleased. A defendant has an absolute right not to testify, if that is his choice.
 "[Counsel for Roberts]: May I comment on it?
 "THE COURT: Well, I think you have.
 "[Counsel for Roberts]: * * * What circumstances do we have — they are difficult to overcome. I would ask you this hypothetical case, that probably may never occur, but just think of this: You and I walk out into the corridor alone during a recess and then on reentering the courtroom you say: `That person took $100 out of my pocket.' Now, there are just the two of us. How do I deny it ever happened, except by taking the stand and saying `I didn't do it'? How would one prove that this never occurred? Now, isn't Roberts in that same position? These men wouldn't testify for him, so there he is —
 "[Counsel for Allston]: Your Honor, I ask Your Honor to instruct the jury to disregard that statement.
 "THE COURT: I have already instructed the jury. I think you should cease commenting upon the other defendants, * * * [Counsel for Roberts].
 "[Counsel for Roberts]: Well, members of the jury, how else would you overcome that statement by someone whom you know is telling the story about you, about a crime which you never committed? How would you go about it? How would you be able to refute this testimony? * * *"
 At the conclusion of the argument for Roberts, counsel for Allston and Tobin moved for a mistrial because of the statements by Counsel for Roberts about his attempts to get the co-defendants to testify. The motion was denied.
 In her charge to the jury the district judge said:
 "The jury is instructed that a defendant in a criminal case has an absolute right not to testify and the jury must not draw any inference against a defendant because he did not testify. A defendant who wishes to testify can do so, in which event his testimony is to be judged by the jury in the same way as that of any other witness."
 
 
 [8]
 18 U.S.C. § 3481 provides:
 "In trial of all persons charged with the commission of offenses against the United States and in all proceedings in courts martial and courts of inquiry in any State, District, Possession or Territory, the person charged shall, at his own request, be a competent witness. His failure to make such request shall not create any presumption against him."
 Counsel's conduct was egregious, especially in view of the fact that although he intended to call the co-defendants as witnesses he at no time moved for a severance on behalf of his client.
 Counsel for defendants in future cases in the District Court should take notice that such conduct may be ground for disciplinary action.
 
 
 [9]
 The error has no effect on the validity of the conviction of Roberts. Moreover, although Tobin originally refused to testify when called by Roberts, he later took the stand, protested his innocence, and attempted to explain his presence in the getaway truck. As we have indicated in our summary of the facts his change of mind was apparently not motivated by pressure from Roberts; on the contrary he decided to testify because he believed that Roberts in his story had departed from the defense which had been agreed upon among the appellants
 
 
 BAZELON, Chief Judge:
 
 48
 I concur in affirmance of these convictions, and in Part III of the majority opinion. Since my approach to the law of probable cause and impeachment of character witnesses differs from that of the majority, I am constrained to discuss these matters briefly.
 
 I.
 
 49
 A police officer has probable cause to make an arrest "if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed" by the person to be arrested. Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).[1] The standard of probable cause is not altered by the fact that the person to be arrested is in a moving vehicle. Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960).[2] In deciding whether or not there is probable cause for an arrest or search, a police officer may not act on subjective notions or generalized expertise: "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," provide probable cause. Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (emphasis added).[3] "The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in the light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard." Id.[4]
 
 
 50
 On that basis, and contrary to Part I of the majority opinion, I do not believe the police had probable cause for arrest when they stopped the truck.[5] Black men with moustaches are not uncommon in the District of Columbia, and I see neither reason nor purpose in subjecting every such man driving a common type of truck with a friend in the back to the indignities of an arrest, simply because he happened to be within several miles of a holdup.[6] Compare Henry v. United States, supra. Nor can the majority opinion stand on its characterization of appellants' conduct as "flight." The Supreme Court has already made it clear that "flight" for probable cause purposes means something more than simply motion in a particular direction. See Brinegar v. United States, 338 U.S. 160, 166 n. 7, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).
 
 II.
 
 51
 Nevertheless, I do not disagree with the majority's conclusion that the police action disclosed by this record was not only proper, but commendable. For although I do not believe that the officers had probable cause to arrest appellants at the time they stopped the truck, I do believe that the officers rightly concluded that the circumstances "warranted further investigation." Terry v. Ohio, supra, 392 U.S. at 22, 88 S.Ct. 1868. The officers, then, had at least the right to stop appellants long enough to ask to talk to them,[7] and I do not think they were required to make this request through the window of a moving vehicle. Compare Rios v. United States, supra, 364 U.S. at 262, 80 S.Ct. 1431. Terry, under such circumstances, allows a search of an individual so far as is "necessary for the discovery of weapons which might be used to harm the officer or others nearby."[8] Since the danger from a concealed person (who may be carrying a weapon) is no less than the danger from a concealed weapon, it seems to me inescapable that the officers were entitled to open the rear of the truck to make sure that no potential attackers were hidden there.[9] Once having done so, they saw three men sitting on mattresses and a torn sack of money. This gave them probable cause for the arrests.
 
 
 52
 My disagreement with the majority here is more than a semantic one. We should not discourage commendable police behavior, and we should not encourage improper behavior. The majority opinion could be read to do both. On the one hand, an officer faced with a similar situation in the future could reasonably conclude that he did not have probable cause for an arrest, and let the truck speed by. On the other hand, if the van after being stopped had proved to be full not of booty but of furniture, the majority's holding that the police had probable cause for arrest when they stopped the truck[10] could nevertheless justify a complete body search of the driver, as well as his forcible removal to the police station and detention at least until he could be brought before a magistrate.[11] That such harassment may be unlikely is no reason we should suggest that it would be proper.
 
 III.
 
 53
 My disagreement with Part II of the majority opinion is primarily a matter of approach. Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L. Ed. 168 (1948) holds only that trial judges have discretion to allow impeachment of character witnesses by questions regarding prior convictions of the defendant. See id. at 487-488, 69 S.Ct. 213 (Frankfurter, J., concurring).[12] Our prior cases make it clear that the trial judge has discretion to exclude any such questions,[13] and that the standards for the exercise of that discretion are similar to those set down in Luck v. United States[14] and its progeny.[15] The majority opinion implies that trial courts have no such discretion; if this view were accepted by a trial judge, unless we could find that the defendant was not prejudiced we might be compelled to reverse.[16] In the instant case, however, discretion was exercised and I find no abuse.
 
 
 
 Notes:
 
 
 [1]
 Accord, e. g., Beck v. Ohio, 379 U.S. 89, 96-97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543, (1925).
 
 
 [2]
 Accord, e. g., Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).
 
 
 [3]
 "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."Id. n. 18. Although the majority opinion praises the trained eye of the policeman, it is unable to point to any "specific and articulable facts" upon which that special training operated.
 
 
 [4]
 The Supreme Court has several times held that review of probable cause determinations is to bestricter when a search or arrest is without a warrant. United States v. Ventresca, 380 U.S. 102, 105-109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Johnson v. United States, 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). The rationale of this rule may indicate that an exception should be made when the circumstances make resort to a magistrate impossible, see Jones v. United States, 362 U.S. 257, 269-271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), but in such circumstances the standard is still at least as high as that used in testing the sufficiency of a warrant. See Chimel v. California, 395 U.S. 752, 761, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), quoting MacDonald v. United States, 335 U.S. 451, 455, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Wong Sun v. United States, supra note 1, 371 U.S. at 479, 83 S.Ct. 407; Johnson v. United States, supra. See also cases cited supra note 2.
 
 
 [5]
 Likewise, I do not believe that in the circumstances of this case the mere stopping of the truck constituted an arrestSee note 7 infra.
 
 
 [6]
 Although the police had a description of some of the offenders' clothing, there is no indication that they recognized any clothing before they stopped the truck
 
 
 [7]
 InTerry, the Court warned that "[w]e thus decide nothing today concerning the constitutional propriety of an investigative `seizure' upon less than probable cause for the purposes of `detention' and/or interrogation." 392 U.S. at 19 n. 16, 88 S.Ct. at 1879. But even if Terry does not sanction the restriction of an individual's movement in order to ask permission to ask further questions, it at least permits detention on less than probable cause long enough to search for weapons. Either rationale would support stopping the truck in this case. See 392 U.S. at 27-28, 88 S.Ct. 1868.
 
 
 [8]
 392 U.S. at 26, 88 S.Ct. at 1882
 
 
 [9]
 This does not mean that officers would be justified in searching, for example, the locked trunk of a car. But here, the officers knew that the back of the truck was occupied; equally important, they had reason to believe that if the driver was implicated in the robbery, three other men were probably nearby
 
 
 [10]
 Despite the majority's reliance on police expertise, its conclusion is contrary to that of at least one of the arresting officers, who testified that "we became suspicious" only after the truck was stopped. Transcript, Motion to Suppress, at p. 23
 
 
 [11]
 See United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948); Bailey v. United States, 128 U.S.App.D.C. 354, 361, 389 F.2d 305, 312 (1967) (Leventhal, J., concurring). The stigma of an arrest record is, unfortunately, not something easily erased.
 
 
 [12]
 Of course, to the extent thatMichelson relied on the efficacy of limiting instructions, see 335 U.S. at 485, 69 S.Ct. 213, it has been undercut by Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Appellants do not, however, challenge the constitutionality of the procedure.
 
 
 [13]
 This conclusion is inescapable, since both Shimon v. United States, 122 U.S. App.D.C. 152, 352 F.2d 449 (1965), and Awkard v. United States, 122 U.S.App. D.C. 165, 352 F.2d 641 (1965), reversed for abuse of that discretion
 
 
 [14]
 121 U.S.App.D.C. 151, 348 F.2d 763 (1965)
 
 
 [15]
 See United States v. Coleman, 137 U.S. App.D.C. ___, 420 F.2d 1313 (decided July 11, 1969); Weaver v. United States, 133 U.S.App.D.C. 66, 71-73, 408 F.2d 1269, 1274-1276 (1969). Of course, in exercising his discretion in the case of character testimony it is not inappropriate for a judge to consider the importance to the defendant of the proposed testimony. See United States v. Wooden, 137 U.S.App.D.C. ___, 420 F.2d 251, decided this day (per Robb, J.); Luck v. United States, supra note 14 at 157, 348 F.2d at 769.
 
 
 [16]
 United States v. Coleman,supra note 15 and cases cited.